1
2
3
4              UNITED STATES DISTRICT COURT
5            NORTHERN DISTRICT OF CALIFORNIA
6
7    DAVID RODRIGUEZ,                    Case No. 14-cv-03620-PJH
8                   Petitioner,
9         v.                            **ORDER DENYING PETITION FOR
                                        WRIT OF HABEAS CORPUS AND
10   J. LIZARRAGA,                      GRANTING CERTIFICATE OF
                                        APPEALABILITY**
11                 Respondent.
                                        Re: Dkt. Nos. 26, 27, 28
12
13        This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C.

14   § 2254.  The court ordered respondent to show cause why the writ should not be granted.

15   Respondent filed an answer and lodged exhibits with the court and petitioner filed a

16   traverse.  For the reasons set out below, the petition is denied.

17                            **BACKGROUND**

18        On December 8, 2011, a jury found petitioner guilty of first degree murder and

19   personal use of a deadly and dangerous weapon.  Clerk's Transcript ("CT") at 912.

20   Petitioner was sentenced to 26 years to life in prison.  *Id.* at 983-84.

21        On September 26, 2013, the California Court of Appeal affirmed the conviction in

22   an unpublished decision.  *People v. Rodriguez*, No. H038219, 2013 WL 5377062, at *1

23   (Cal. Ct. App. Sep. 26, 2013).  The California Supreme Court denied review on

24   December 18, 2013.  Answer, Ex. 9.  Petitioner filed this federal habeas petition on

25   August 11, 2014.  Docket No. 1.  The petition was stayed so petitioner could exhaust

26   further claims.  Petitioner filed a petition in the California Supreme Court on January 15,

27   2015, that was summarily denied on March 25, 2015, with citations to *People v. Duvall*, 9

28   Cal. 4th 464, 474 (1995) and *In re Swain*, 34 Cal. 2d 300, 304 (1949).  Answer, Exs. 10,

United States District Court
Northern District of California

11.  On December 8, 2015, this court lifted the stay, reopened the case and ordered respondent to show cause why the petition should not be granted.

## STATEMENT OF FACTS

The facts relevant to the petition, as described by the California Court of Appeal, are as follows:

The Prosecution's Evidence

At 10:30 a.m. on March 18, 1981, Robert Oswald's half-brother, Paul Bernards, entered Oswald's San Jose apartment, and Bernards saw Oswald's dead body on the bedroom floor. Bernards called the police.

San Jose Police Department Sergeant Henry Schriefer responded to Oswald's apartment.  When Sergeant Schriefer entered the apartment, he saw a bloody razor blade and a small amount of blood on the living room floor.  The living room curtains were closed, and there was blood on the cord that controlled the opening and closing of the curtains.  A coffee table was pushed up against the couch in the living room, and a planter on top of the table was tipped over. There was a small amount of blood on the couch.  Sergeant Schriefer entered the bedroom and saw Oswald's body, which was covered with lacerations, puncture wounds, and abrasions.  A serrated knife and a bloody towel were on the floor near Oswald's body.  Sergeant Schriefer saw a wet wash rag and a bloody towel in the dressing room, and he saw diluted blood on the sink, toilet, and floor of the bathroom. Sergeant Schriefer's report noted that "[f]or the amount of injuries to the victim, very little blood was noted."

Dr. John Hauser performed an autopsy on Oswald's body on March 19, 1981.  Dr. Hauser discovered several fractured bones in the neck, and he testified that such fractures were common in manual strangulation cases.  Dr. Hauser saw numerous cuts and stab wounds on the face, neck, trunk, hands, wrists, abdomen, and left arm.  In particular, Dr. Hauser noted cuts on the forehead, cheeks, and eyelids, as well as "abundant" bleeding in the left eye.  A one-and-a-half-inch cut extended from the left side of the mouth up to the left cheek, and a one-inch cut extended from the right side of the mouth up to the right check.  Each of these cuts completely penetrated the thickness of the cheek.  There was a laceration at the base of the tongue and a little bleeding associated with the laceration.  There were cuts on and near the ear, one of which gaped open to reveal cartilage.  Dr. Hauser noted two stab wounds on the chest, two stab wounds on the abdomen, cuts on the colon and bowel, and a small amount of blood in the belly.  There were numerous cuts on the back and several cuts on the wrists.  Dr. Hauser determined that Oswald's death was caused by manual strangulation and multiple cuts

and stab wounds.

Dr. Michelle Jorden testified as an expert in forensic and anatomic pathology. She opined that the primary cause of Oswald's death was manual strangulation, and that the many stab and incise wounds were contributory causes of Oswald's death. She explained that the "massive" fractures in Oswald's neck, along with the associated bruising and bleeding, led her to believe that manual strangulation was the primary cause of Oswald's death. She further explained, "This is probably the worst injury I have seen documented in a strangulation case." She classified the stab and incise wounds as contributory causes of death because those wounds alone could have potentially killed Oswald, and because the stab and incise wounds decreased the likelihood that Oswald would survive the strangulation. Dr. Jorden determined that the manner of Oswald's death was homicide.

Dr. Jorden testified that Oswald's injuries fell into three different categories: antemortem (injuries inflicted when Oswald was alive), perimortem (injuries inflicted when Oswald was close to death), and postmortem (injuries inflicted when Oswald was dead). She opined that the many cuts on Oswald's back were inflicted during the antemortem period, explaining that the wounds actively bled and soaked Oswald's shirt with blood. Due to the bleeding associated with the cuts and stab wounds on Oswald's eyelids, ear, neck, chest, and abdomen, Dr. Jorden concluded that those wounds were inflicted during the antemortem or perimortem period. She determined that the cuts to Oswald's wrists were inflicted during the perimortem period, explaining that there was very little blood associated with the cuts. Due to the lack of blood in the surrounding tissues, Dr. Jorden determined that the cuts to Oswald's mouth were inflicted during the postmortem period.

San Jose Police Department Lieutenant Michael Destro was present at the autopsy, and he saw that a gold charm and ring had adhered to Oswald's upper back. The charm and ring appeared to have been forcibly separated from a necklace chain. The chain was not on Oswald's body, and police did not find a chain during an extensive search of Oswald's apartment.

Four bloodstains were present on the left front pocket of the pants Oswald was wearing. The stains were symmetrical and linear in pattern. There were two additional bloodstains by the entry to the pocket, as well as a single bloodstain on the interior lining of the pocket. A bloodstain expert opined that the bloodstains were consistent with four bloody fingers touching the pocket and a single bloody finger pulling the lining out.

Police investigation did not produce a suspect, and the case became a cold case. In 2008, criminalists conducted DNA testing on several items of evidence. The testing revealed

3

that defendant was the source of DNA obtained from the bloody razor blade. Defendant was the source of DNA obtained from the linear bloodstains on the left front pocket of Oswald's pants, as well as the source of DNA obtained from the lining of the pocket. Defendant was the source of DNA obtained from a bloodstained orange and yellow towel. Defendant was a "possible major contributor" to a mixture of DNA on a bloodstained blue, green, and white towel.

As part of the autopsy, Dr. Hauser subjected Oswald's blood to toxicology testing. The blood contained 0.3 parts per million of methamphetamine.

Criminalist Trevor Gillis testified as an expert in drug symptomatology. He explained that a blood-methamphetamine concentration of 0.3 parts per million is a non-fatal concentration and an average concentration in the abuse population. He also explained that it is "next to impossible to predict symptomatology" from the concentration of methamphetamine in a person's blood. He did, however, describe the following "spectrum of effects" that could be caused by methamphetamine ingestion: increased heart rate, increased breathing rate, panic, irritability, nervousness, and increase in adrenaline. Gillis noted that, with sustained use, methamphetamine can cause a psychotic break. He also noted that some studies show that violent activity is associated with methamphetamine use, and those studies further show that a methamphetamine user is more likely to be the victim than the aggressor.

Bernards testified that Oswald used methamphetamine. Bernards had "frequently" seen Oswald when he was under the influence of methamphetamine, and Bernards testified that Oswald was always jubilant and always in a good mood when he was under the influence of methamphetamine. Bernards never saw Oswald become aggressive, irritable, or violent when he was under the influence of methamphetamine.

The Defense Evidence

Defendant testified that he was working as a prostitute in March of 1981. Oswald agreed to pay defendant money for sex, and they went to Oswald's apartment. Defendant and Oswald sat in the living room, and defendant used a razor blade to cut lines of methamphetamine. Defendant and Oswald each snorted one line of methamphetamine. Approximately 10 to 15 minutes after they ingested the methamphetamine, Oswald became "aggressive" and "aggravated." Oswald told defendant that he could not leave the apartment, and Oswald cut defendant's arm and fingers with the razor blade. Oswald gave defendant a towel to wipe the blood from his injuries, and Oswald said, "See what you made me do?" Defendant stood up to leave the apartment. Oswald stabbed defendant's shoulder with a steak knife, causing a cut that was "not life-threatening." Oswald looked "crazy" and "wild," and defendant was afraid that he was going

4

to die.  Defendant and Oswald struggled for control of the knife.  Defendant "did everything [he] possibly could to stay alive."   Defendant admitted punching Oswald, strangling Oswald, and stabbing Oswald's chest and abdomen. Defendant eventually gained control of the knife, and Oswald stopped struggling.   Defendant dragged Oswald into the bedroom, and defendant ran out of the apartment.

Defendant testified that the methamphetamine he ingested on the night of the charged crime made him feel "submissive, easy-going, friendly."  The methamphetamine did not make defendant feel agitated.   Defendant admitted that methamphetamine can "alter someone's perception of things around them."   Defendant emphasized, however, that the methamphetamine he ingested did not "take the fear away." He also emphasized that the methamphetamine he ingested "didn't change the way [he] looked at things."   Defendant explained that his testimony regarding the charged crime came "directly from [his] mind."

Dr. Susan Ditter, an expert in forensic psychology and neurology, performed a "psychological autopsy" on Oswald.  A psychological autopsy is a reconstruction of "the personality, the relationships, and the entire life history" of a dead person. In order to conduct the psychological autopsy of Oswald, Dr. Ditter consulted 26 sources of information, including mental health records from Oswald's hospitalizations at state institutions, interviews with Oswald's family and friends, and police reports.   She concluded that Oswald suffered from borderline personality disorder and polysubstance abuse. She also determined that when Oswald was in a romantic or sexual relationship, he would engage in "shoving, slapping, pushing, intense verbal abuse, screaming." When Oswald was under the influence of methamphetamine, he would become "enraged to the point of violence with a weapon."

Dr. Paul Herrmann, an expert in forensic pathology, testified that Oswald's death was caused by strangulation.  He testified that "a lot" of Oswald's stab wounds and incise wounds were inflicted after Oswald was dead.  Specifically, Dr. Herrmann testified that the cuts to Oswald's mouth, neck, and ear were inflicted after Oswald was dead, and that the stab wounds on Oswald's abdomen were "absolutely characteristic" of wounds inflicted after death.  He testified that the cuts on Oswald's back were "probably" inflicted before Oswald died.

A bloodstain expert opined that the stains on the left front pocket of Oswald's pants were attributable to "low-velocity droplets caused by gravity." The expert testified that "no bloody fingers went in and out of that pocket."

*Rodriguez*, 2013 WL 5377062, at *1-3.

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

United States District Court
Northern District of California

1    The state court decision to which § 2254(d) applies is the "last reasoned decision"

2 of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v.*

3 *Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion

4 from the highest state court to consider the petitioner's claims, the court looks to the last

5 reasoned opinion.  *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072,

6 1079 n.2 (9th Cir. 2000).  The court looks to the California Court of Appeal opinion for the

7 first claim in the petition.

8    The standard of review under AEDPA is somewhat different where the state court

9 gives no reasoned explanation of its decision on a petitioner's federal claim and there is

10 no reasoned lower court decision on the claim.  In such a case, as with claims two, three

11 and four, a review of the record is the only means of deciding whether the state court's

12 decision was objectively reasonable.  *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir.

13 2003); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  When confronted with

14 such a decision, a federal court should conduct an independent review of the record to

15 determine whether the state court's decision was an objectively unreasonable application

16 of clearly established federal law.  *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982.

17                                          **DISCUSSION**

18    As grounds for federal habeas relief, petitioner asserts that: (1) the conviction must

19 be reversed because the trial court's jury instruction regarding voluntary intoxication

20 failed to describe the relationship between petitioner's methamphetamine use and the

21 specific intent required for first degree murder by means of torture; (2) the trial court erred

22 in failing to hold a competency hearing; (3) trial and appellate counsel were ineffective

23 with for failing to raise petitioner's competency and for failing to adequately aid in plea

24 bargaining; and (4) there was insufficient evidence to support the conviction.

25    **I.      JURY INSTRUCTION**

26    Petitioner asserts that the trial court erred by not issuing a more specific jury

27 instruction regarding petitioner's voluntary intoxication and the specific intent required for

28 first degree murder by means of torture.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**BACKGROUND**

The California Court of Appeal set forth the following facts:

> The trial court instructed the jury on three theories of first degree murder: 1) premeditated murder; 2) murder by means of torture; and 3) felony murder during a robbery or attempted robbery.

> The trial court instructed the jury regarding the elements of torture murder, pursuant to CALCRIM No. 521, as follows: "The defendant is guilty of first degree murder if the People have proved that the defendant murdered by torture.  The defendant murdered by torture if: [¶] 1) He willfully, deliberately, and with premeditation intended to inflict extreme and prolonged pain on the person killed while that person was still alive; [¶] 2) He intended to inflict such pain on the person killed for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason; [¶] 3) The acts causing death involved a high probability of death; [¶] 4) The torture was the cause of death."

> Pursuant to CALCRIM No. 625, the trial court instructed the jury regarding voluntary intoxication and its effect on mental state: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with express or implied malice, or whether the defendant acted with deliberation and premeditation, or whether the defendant had the specific intent to commit robbery or attempted robbery with respect to the theory of First Degree Felony Murder.  [¶]  A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing it that it could produce an intoxicating effect, or willingly assumes the risk of that effect.   [¶]   You may not consider evidence of voluntary intoxication for any other purpose."

> Defendant did not object to the instruction regarding voluntary intoxication.

*Rodriguez*, 2013 WL 5377062, at *3-4.

**LEGAL STANDARD**

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  *Id.* at 72; *Cupp v. Naughten*, 414 U.S. 141, 147

1    (1973). The instruction may not be judged in artificial isolation, but must be considered in

2    the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S. at

3    72.  In other words, the court must evaluate jury instructions in the context of the overall

4    charge to the jury as a component of the entire trial process.  *United States v. Frady*, 456

5    U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

6          A state trial court's refusal to give an instruction does not alone raise a ground

7    cognizable in a federal habeas corpus proceeding.  *See Dunckhurst v. Deeds*, 859 F.2d

8    110, 114 (9th Cir. 1988).  The error must so infect the trial that the defendant was

9    deprived of the fair trial guaranteed by the Fourteenth Amendment.  *See id.*

10         Due process does not require that an instruction be given unless the evidence

11   supports it.  *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422

12   F.3d 1012, 1029 (9th Cir. 2005).  The defendant is not entitled to have jury instructions

13   raised in his or her precise terms where the given instructions adequately embody the

14   defense theory.  *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).

15         Whether a constitutional violation has occurred will depend upon the evidence in

16   the case and the overall instructions given to the jury.  *See Duckett v. Godinez*, 67 F.3d

17   734, 745 (9th Cir. 1995).  An examination of the record is required to see precisely what

18   was given and what was refused and whether the given instructions adequately

19   embodied the defendant's theory.  *See United States v. Tsinnijinnie*, 601 F.2d 1035, 1040

20   (9th Cir. 1979). In other words, examining the record allows a determination of whether

21   the instruction given was so prejudicial as to infect the entire trial and so deny due

22   process. *See id.*

23         **ANALYSIS**

24         Respondent first argues that this claim is procedurally defaulted because the state

25   court found that petitioner did not request clarifying language for the jury instruction and

26   raised no objection to the instruction.  *Rodriguez*, 2013 WL 5377062, at *4.  The

27   California Court of Appeal held the claim was not cognizable on appeal.  *Id.*  A federal

28   court will not review questions of federal law decided by a state court if the decision also

United States District Court
Northern District of California

9

1    rests on a state law ground that is independent of the federal question and adequate to

2    support the judgment.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  The Ninth

3    Circuit has recognized and applied the California contemporaneous objection rule in

4    affirming denial of a federal petition on grounds of procedural default where there was a

5    complete failure to object at trial.  *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th

6    Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).  In cases in which

7    a state prisoner has defaulted his federal claims in state court pursuant to an

8    independent and adequate state procedural rule, federal habeas review of the claims is

9    barred unless the prisoner can demonstrate cause for the default and actual prejudice as

10   a result of the alleged violation of federal law, or demonstrate that failure to consider the

11   claims will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S at 750.

12   Petitioner has failed to present any arguments regarding cause and prejudice for the

13   procedural default.  Even though this claim is procedurally defaulted, the court will still

14   look to the merits of the claim.

15          The California Court of appeal denied this claim:

16          Moreover, even if defendant had requested an instruction that
             described the relationship between voluntary intoxication and
17           the mental state for torture murder, the trial court was not
             required to give such an instruction.  "A defendant is entitled
18           to such an instruction only when there is substantial evidence
             of the defendant's voluntary intoxication and the intoxication
19           affected the defendant's 'actual formation of specific intent.'"
             (*People v. Williams* (1997) 16 Cal. 4th 635, 677.)  Here, there
20           was not substantial evidence that defendant was intoxicated
             as a result of his ingestion of methamphetamine, and there
21           was not substantial evidence that the ingestion of
             methamphetamine affected defendant's actual formation of
22           specific intent to torture.  Defendant testified that the
             methamphetamine he ingested made him feel "submissive,
23           easy-going, friendly."  None of defendant's reported symptoms
             corresponded with the expert testimony regarding the
24           "spectrum of effects" caused by methamphetamine
             intoxication, namely increased heart rate, increased breathing
25           rate, panic, irritability, nervousness, and increase in
             adrenaline.  Thus, there was no evidence that defendant was
26           intoxicated as a result of his methamphetamine ingestion.
             Additionally, defendant's testimony showed that the
27           methamphetamine did not affect his perception of events or
             his thought process.  Defendant specifically testified that the
28           methamphetamine he ingested "didn't change the way [he]

United States District Court
Northern District of California

10

looked at things." He also testified that his methamphetamine use did not affect the fear that he felt. There was therefore no evidence that defendant's ingestion of methamphetamine affected his actual formation of specific intent to torture. Accordingly, because there was insufficient evidence of intoxication affecting formation of specific intent, the trial court was not required to instruct the jury regarding the relationship between intoxication and the specific intent for torture murder. (*See id.* at pp. 677–678 [defendant's statements that he was "'doped up'" and "smokin' pretty tough" did not constitute substantial evidence in support of a voluntary intoxication instruction because there was "no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent"].)

*People v. Pensinger*, *supra*, 52 Cal.3d 1210 is instructive. In *Pensinger*, the trial court instructed on several theories of murder liability, including premeditated murder and murder by means of torture. (*Id.* at p. 1236.) The trial court instructed the jury that evidence of the defendant's intoxication could be considered in determining whether the defendant acted with malice or the specific intent to kill. (*Id.* at p. 1242.) On appeal, the defendant argued that the trial court "erred in failing to instruct on the relationship of intoxication to the intent necessary to prove a torture murder, that is, the intent to inflict cruel suffering." (*Ibid.*) Our Supreme Court held that the trial court did not err in failing to instruct on the relationship between voluntary intoxication and the requisite intent for torture murder, reasoning that "there was not substantial enough evidence of intoxication in this case to require the giving of the instruction." (*Id.* at p. 1243.)

Defendant's case is analogous to *Pensinger*. Like *Pensinger*, the trial court instructed on torture murder and several other theories of murder liability, and the trial court's instruction on voluntary intoxication failed to describe the relationship between intoxication and the mental state required for torture murder. Also like *Pensinger*, there was not substantial evidence that defendant was in fact intoxicated. Thus, *Pensinger* compels us to conclude the trial court here did not err in failing to instruct the jury regarding the relationship between intoxication and the mental state for torture murder.

Citing *People v. Castillo* (1997) 16 Cal. 4th 1009 (*Castillo*), defendant argues: "Having properly concluded the trial evidence supported instructions on how the jurors could consider the evidence of [defendant's] voluntary intoxication, the court was bound to instruct correctly on that defense." Defendant's argument is flawed in two respects. First, as discussed above, the evidence did not support an instruction on voluntary intoxication. Second, as explained below, *Castillo* does not require us to conclude that the trial court committed instructional error.

Castillo held that a defense attorney did not render ineffective assistance in failing to request a pinpoint instruction

11

specifically relating voluntary intoxication to the mental state of premeditation and deliberation. (*Castillo*, *supra*, 16 Cal.4th at p. 1012.) *Castillo* reasoned that such a pinpoint instruction was unnecessary because "the trial court correctly and fully instructed the jury on the way in which the evidence of intoxication related to defendant's mental state, including premeditation." (*Id.* at p. 1015–1016.) In dicta, *Castillo* noted that "[e]ven if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*Id.* at p. 1015.)

*Castillo* did not consider the issue presented in this case— whether the trial court erred in failing to connect the voluntary intoxication instruction to the requisite intent for torture murder where there was not substantial evidence that defendant was intoxicated. Thus, because "'cases are not authority for propositions not considered,'" *Castillo* does not require us to find instructional error. (*People v. Jones* (1995) 11 Cal. 4th 118, 123, fn. 2.) Moreover, even if we relied on the *Castillo* dicta regarding the trial court's duty to correctly instruct the jury, we would not conclude that the voluntary intoxication instruction was legally incorrect. Defendant does not dispute that the trial court's instruction correctly stated the legal principles regarding voluntary intoxication. Defendant simply contends that the trial court failed to connect those principles to the mental state for torture murder. Given our conclusion that there was insufficient evidence of intoxication to support an instruction regarding the relationship between intoxication and the specific intent for torture murder, we cannot conclude that the voluntary intoxication instruction's silence regarding torture murder rendered the voluntary intoxication instruction legally incorrect.

In summary, we conclude that the trial court did not err in failing to instruct the jury regarding the relationship between voluntary intoxication and the requisite intent for torture murder. We therefore affirm the judgment of conviction.

*Rodriguez*, 2013 WL 5377062, at *4-6 (footnote omitted).

Petitioner has failed to demonstrate that the state court opinion was an unreasonable application of Supreme Court authority or an unreasonable determination of the facts. As noted by the state court, petitioner testified at trial that he ingested the methamphetamine, which made him feel "kind of submissive, easy-going, friendly." Reporter's Transcript ("RT") at 1664. He stated that it did not alter his perception regarding the fear he felt and did not cause him to feel agitated or change the way he looked at things. RT at 1685, 1699, 1755. Based on this testimony it was not unreasonable for the trial court to provide only the basic voluntary intoxication instruction,

especially as petitioner never requested an additional instruction.

In addition, the defense theory at trial was self-defense, and trial counsel argued during pretrial motions that the drugs did not affect petitioner the way they affected the victim.  RT at 85.  Due process does not require that an instruction be given unless the evidence supports it, and the evidence did not support the theory that petitioner presents in this petition.  *See Hopper*, 456 U.S. at 611; *Menendez*, 422 F.3d at 1029.  Even if petitioner could demonstrate that the trial court erred, he has not shown that this error deprived him of the fair trial guaranteed by the Fourteenth Amendment.  His own testimony asserted that the drugs made him feel somewhat submissive, easy-going and friendly, not that the drugs had any effect on his intent to commit the murder.  For all these reasons, this claim is denied.

## II.    COMPETENCY HEARING

Petitioner next argues that the trial court violated his rights by failing to sua sponte hold a competency hearing.

### LEGAL STANDARD

Due process requires a trial court to order a psychiatric evaluation or conduct a competency hearing sua sponte if the court has a good faith doubt concerning the defendant's competence.  *Pate v. Robinson*, 383 U.S. 375, 385 (1966).  To be competent to stand trial, a defendant must have (1) "a rational as well as factual understanding of the proceedings against him," and (2) "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding."  *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam).

Where the evidence before the trial court raises a bona fide doubt as to a defendant's competence to stand trial, the judge on his own motion must conduct a competency hearing.  *Pate*, 383 U.S. at 385.  Evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, and one of the factors standing alone may, in some circumstances, be sufficient.  *Drope v. Missouri*, 420

United States District Court
Northern District of California

13

U.S. 162, 180 (1975).  A lawyer's representation concerning the competence of his client also should be considered, as defense counsel will often have the best-informed view of the defendant's ability to participate in his defense.  *See Medina v. California*, 505 U.S. 437, 450 (1992).

A state court's finding of competency to stand trial (as well as to plead guilty) is presumed correct if fairly supported by the record.  *Deere v. Cullen*, 718 F.3d 1124, 1145 (9th Cir. 2013).  No formal evidentiary or competency hearing is required for the presumption to apply.  *Id.* at 1144-45.  Petitioner must come forward with clear and convincing evidence to rebut the presumption.  *Id.* at 1145.

The Supreme Court has not determined the particular nature or quantum of evidence necessary to trigger a competency hearing.  *Drope*, 420 U.S. at 172.  "There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated."  *Id.* at 180.  In reviewing a claim of error resulting from the state court's failure to hold a competency hearing, a federal habeas court may consider only the evidence that was before the trial judge.  *Maxwell v. Roe*, 606 F.3d 561, 566, 568 (9th Cir. 2010).

**ANALYSIS**

This claim was summarily denied by the California Supreme Court with citations to *People v. Duvall*, 9 Cal. 4th 464, 474 (1995) and *In re Swain*, 34 Cal. 2d 300, 304 (1949). These citations stand for the proposition that the claims were not presented with sufficient particularity, and the denial is similar to a dismissal with leave to amend.  *See Curiel v. Miller*, 830 F.3d 864, 869, 871 (9th Cir. 2016) (en banc).  Petitioner has not filed a new petition with the California Supreme Court with additional information.  Therefore, this claim and the other claims in the state petition are unexhausted.  The court will still look to the merits of the claims and deny them.  *See Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court considering a habeas petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable").

Petitioner presents only a few allegations to support his contention that the trial court violated his rights by failing to sua sponte hold a competency hearing.  He states he has a documented history of mental problems, yet he fails to include any documentation of this history and he fails to even describe his mental problems.  Petitioner's conclusory allegations without support do not warrant habeas relief.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

The court has also conducted a review of the record and does not find that petitioner is entitled to relief.  Petitioner testified competently in his own defense about events that occurred 30 years prior to trial.  RT at 1652-1774.  He testified that he reviewed police reports, defense investigator reports, autopsy reports, and that he discussed them with his attorney.  RT at 1654, 1680-81.  He also testified that he paid close attention during the trial.  RT at 1681.  Petitioner's testimony in his own defense was the "quintessential act of participating in one's own trial."  *Benson v. Terhune*, 304 F.3d 874, 885 (9th Cir. 2002).  In *Benson*, the defendant's "lengthy, logical and cogent trial testimony reflects a sufficient ability to understand the proceedings and to assist in her own defense."  *Id.* at 886.

Petitioner identifies nothing in the record to support his claim that he was incompetent at the time of his trial, and he stated at sentencing that he had changed for the better since the victim's death.  RT at 2336-38.  To the extent petitioner seeks discovery and an evidentiary hearing and argues that these will provide additional information, those requests are denied as will be discussed below.  For all these reasons, this claim is denied.

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner next argues that trial and appellate counsel were ineffective for failing to raise petitioner's competency and for failing to adequately aid in plea bargaining.

### LEGAL STANDARD

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but

United States District Court
Northern District of California

15

effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).
The benchmark for judging any claim of ineffectiveness must be whether counsel's
conduct so undermined the proper functioning of the adversarial process that the trial
cannot be relied upon as having produced a just result.  *Id.*

In order to prevail on a Sixth Amendment ineffectiveness of trial counsel claim,
petitioner must establish two things.  First, he must establish that trial counsel's
performance was deficient, i.e., that it fell below an "objective standard of
reasonableness" under prevailing professional norms.  *Strickland*, 466 U.S. at 687-88.
Second, he must establish that he was prejudiced by trial counsel's deficient
performance, i.e., that "there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.
A reasonable probability is a probability sufficient to undermine confidence in the
outcome.  *Id.*

The Due Process Clause of the Fourteenth Amendment guarantees a criminal
defendant the effective assistance of counsel on his first appeal as of right.  *Evitts v.
Lucey*, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate
counsel are reviewed according to the standard set out in *Strickland*.  *Smith v. Robbins*,
528 U.S. 259, 285 (2000).  First, the petitioner must show that appellate counsel's
performance was objectively unreasonable, which in the appellate context requires the
petitioner to demonstrate that appellate counsel acted unreasonably in failing to discover
and brief a merit-worthy issue.  *Smith*, 528 U.S. at 285.  Second, the petitioner must
show prejudice, which in this context means that the petitioner must demonstrate a
reasonable probability that, but for appellate counsel's failure to raise the issue, the
petitioner would have prevailed in his appeal.  *Id.* at 285-86.  It is important to note that
appellate counsel does not have a constitutional duty to raise every nonfrivolous issue
requested by defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).  The
weeding out of weaker issues is widely recognized as one of the hallmarks of effective
appellate advocacy.  *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

1

**ANALYSIS**

2    Similar to the claim above, this claim was not exhausted in state court, but the

3    court will still look to the merits.  Petitioner first argues that trial and appellate counsel

4    were ineffective for failing to raise his competency at trial and on appeal.  As discussed

5    above, there is no evidence that petitioner was incompetent at trial, and the evidence

6    demonstrates that petitioner understood the proceedings.  Nor does petitioner allege that

7    he told either attorney that he was experiencing mental problems that would impair his

8    competency.  Petitioner cannot show that either his trial or appellate counsel was

9    deficient, and even if he could, petitioner cannot demonstrate prejudice.  Counsel is not

10   required to make a futile motion.  *Styers v. Schriro*, 547 F.3d 1026, 1030 n.5 (9th Cir.

11   2008).  Had trial counsel made a motion or had appellate counsel raised the issue on

12   appeal, the allegations were refuted by the trial record and the motion and appeal would

13   have been denied.  Petitioner is not entitled to habeas relief on this claim.

14   Petitioner also contends that his trial attorney failed to advise him of a plea offer

15   that contained a fixed expiration date.  However, petitioner provides no information about

16   the content of the plea offer, the expiration date, and how he became aware of it.  He

17   provides no documentation to support the existence of the plea offer, nor does he cite to

18   any such documentation in the record.  A review of the record provides no evidence to

19   support petitioner's allegation.

20   Defense counsel's failure to communicate a formal plea offer from the prosecution

21   regarding a plea with favorable terms and conditions—such as a lesser sentence, a

22   conviction on lesser charges, or both—to the defendant, and allowing that offer to lapse,

23   renders deficient performance.  *Missouri v. Frye*, 132 S. Ct. 1399, 1408-09 (2012).  In

24   order to demonstrate prejudice in a case where a plea offer has expired, or been rejected

25   because of counsel's deficient performance, a defendant must demonstrate that:  (1) he

26   would have accepted the offer had he been afforded effective assistance of counsel, and

27   (2) there is a reasonable probability that the plea would have been entered, taking into

28   consideration any discretion the prosecution or trial court had in preventing the offer from

United States District Court
Northern District of California

being accepted or implemented.  *Id.* at 11.

In addition to not describing the substance of the plea offer, petitioner does not state that he would have accepted it.  He discusses the legal standard set forth in *Frye*, and paraphrases the language regarding the acceptance of a plea offer, but he does not state that he would have accepted it.

Petitioner is not entitled to habeas relief on this claim because he has failed to show that he would have accepted the plea offer and that the plea would have been entered.  His conclusory allegations with no support are insufficient.  *See Borg*, 24 F.3d at 26; *see also Dows v. Wood*, 211 F.3d 480, 486–87 (9th Cir. 2000) (petitioner's "self-serving affidavit" is insufficient evidence of counsel's lack of preparation to prove he was constitutionally ineffective).  Nor can petitioner show that appellate counsel was ineffective for failing to raise this frivolous claim that lacks any evidentiary support.  *See Jones*, 463 U.S. at 751-54.    This claim is denied.

## IV.    SUFFICIENCY OF THE EVIDENCE

Petitioner argues that there was insufficient evidence to support his conviction.

**LEGAL STANDARD**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ."  *Coleman v. Johnson*, 132 S. Ct. 2060, 2062, 2064 (2012) (per curiam) (finding that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of Jackson when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support

petitioner's conviction).  A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1993).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Payne*, 982 F.2d at 338 (*quoting Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt has there been a due process violation.  *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

### ANALYSIS

The court will look to the merits of this unexhausted claim, but Petitioner is not entitled to relief.  He admitted to punching, strangling and stabbing the victim.  RT at 1670-75, 1704-35.  Petitioner was six feet, two inches tall and weighed 145 pounds while the victim was five feet, seven inches tall and weighed 128 pounds.  RT at 380, 1649.  Dr. Jorden, a medical examiner, testified that the victim's death was a homicide caused by strangulation with the contributory causes of multiple stab and incise wounds.  RT at 1515.  DNA evidence linked petitioner to bloodstains on the razor blade, the victim's pants and several towels.  RT at 828-32, 846-47, 853-56, 860-62, 868-69, 913-28, 933-40, 1647-48.  Petitioner has failed to demonstrate that no rational trier of fact could have found proof of guilt beyond a reasonable doubt based on this evidence.  The claim is denied.

### MOTIONS

Petitioner has also filed motions for an evidentiary hearing, discovery and to expand the record.  His motions only present general legal arguments and do not provide any specific allegations.  The motion for an evidentiary hearing is denied because in reviewing the reasonableness of a state court's decision to which § 2254(d)(1) applies, a district court may rely only on the record that was before the state court.  *See Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011) (holding that new evidence presented at

United States District Court
Northern District of California

1  evidentiary hearing cannot be considered in assessing whether state court's decision

2  "was contrary to, or involved an unreasonable application of, clearly established Federal

3  law" under § 2254(d)(1)).  Therefore, a federal court generally is precluded from

4  supplementing the record with facts adduced for the first time at a federal evidentiary

5  hearing when a petitioner's claim has been adjudicated on the merits in state court.  With

6  respect to petitioner's claims that were not denied on the merits in state court, he has

7  failed to meet his burden to demonstrate that he is entitled to an evidentiary hearing by

8  only presenting general arguments.

9  A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to

10  discovery as a matter of ordinary course.  *See Bracy v. Gramley*, 520 U.S. 899, 904

11  (1997).  However, Rule 6(a) of the Federal Rules Governing Section 2254 Cases, 28

12  U.S.C. foll. § 2254, provides that a "judge may, for good cause, authorize a party to

13  conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of

14  discovery."  Before deciding whether a petitioner is entitled to discovery under Rule 6(a)

15  the court must first identify the essential elements of the underlying claim.  *See Bracy*,

16  520 U.S. at 904 (difficulties of proof aside, petitioner's allegation of judicial bias, if proved,

17  would violate due process clause).  The court must then determine whether the petitioner

18  has shown "good cause" for appropriate discovery to prove his claim.  *See id*.  Petitioner

19  has failed to show good cause by essentially stating, with no specificity, that he seeks all

20  information and documents related to his case.

21  **APPEALABILITY**

22  The federal rules governing habeas cases brought by state prisoners require a

23  district court that denies a habeas petition to grant or deny a certificate of appealability

24  ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll.

25  § 2254 (effective December 1, 2009).

26  To obtain a COA, petitioner must make "a substantial showing of the denial of a

27  constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the

28  constitutional claims on the merits, the showing required to satisfy § 2253(c) is

20

straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that the first claim in the petition regarding the jury instruction meets the above standard and accordingly GRANTS the COA solely for that claim.  *See generally Miller-El*, 537 U.S. at 327.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  Petitioner is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

### CONCLUSION

1.  The petition for writ of habeas corpus is **DENIED** on the merits.  A certificate of appealability is **GRANTED**.  *See* Rule11(a) of the Rules Governing Section 2254 Cases.

2.  Petitioner's motions (Docket Nos. 26, 27, 28) are **DENIED**.

3.  The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: November 21, 2016

_____
PHYLLIS J. HAMILTON
United States District Judge

\\candoak.cand.circ9.dcn\data\users\PJHALL\_psp\2014\2014_03620_Rodriguez_v_Lizarraga_(PSP)\14-cv-03620-PJH-hc.docx

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID RODRIGUEZ,<br><br>             Plaintiff,<br><br>      v.<br><br>J. LIZARRAGA,<br><br>             Defendant. | Case No.  14-cv-03620-PJH<br><br>**CERTIFICATE OF SERVICE** |

      I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

      That on November 21, 2016, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

David  Rodriguez ID: AL2755
Mule Creek State Prison
P.O. Box 409040
Ione, CA 95640

Dated: November 21, 2016

Susan Y. Soong
Clerk, United States District Court

By: _Nichole Peric_ __
Nichole Peric, Deputy Clerk to the
Honorable PHYLLIS J. HAMILTON